UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

Case No. 4:21-CR-40070-KES

UNITED STATES OF AMERICA,      )
                               )
     GOVERNMENT,               )
                               )
     -v-                       )
                               )
IBRAHIM NASR IBRAHIM,          )
                               )
     DEFENDANT.                )      Sioux Falls, South Dakota
                               )      October 31, 2022, 2:01 p.m.
_____)


PUBLIC TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE KAREN E. SCHREIER

UNITED STATES DISTRICT JUDGE

(PURSUANT TO STANDING ORDER 16-04, PORTIONS OF ALL CHANGE OF

PLEA AND SENTENCING TRANSCRIPTS ARE RESTRICTED.)

Appearances:

FOR THE GOVERNMENT          Jeremy Jehangiri, ESQ., AUSA
                            United States Attorney's Office
                            P.O. Box 2638
                            Sioux Falls, SD  57101

FOR THE DEFENDANT           Tracye L. Sherrill, ESQ.
                            May & Johnson, P.C.
                            P.O. Box 88738
                            Sioux Falls, SD  57109

     Proceedings reported by machine stenography; transcript
prepared utilizing computer-aided transcription.

(Call to the order of the Court.)

THE COURT: This is the time scheduling for a continuation of the sentencing hearing in United States of America versus Ibrahim Nasr Ibrahim.

Would counsel please note their appearances for the record.

MR. JEHANGIRI: Good afternoon, Your Honor. Jeremy Jehangiri behalf of the United States.

MS. SHERRILL: Tracye Sherrill on behalf of the defendant, Your Honor.

THE COURT: And at our last hearing, Ms. Sherrill had raised an issue about prosecutorial misconduct, and we continued the hearing so that you could provide the Court with any case law, Ms. Sherrill.

MS. SHERRILL: Thank you, Your Honor.

Well, Your Honor was correct in that there is no case law that addresses a breach of plea agreement based solely on the government's failure to make an objection at the time of the PSR. There is relevant case law that demonstrates that there are arguments for breach of plea not only involving the government's failure to make the written objections, but the government's position taken at the sentencing hearing.

In this instance, at this time, the defendant can only assume what position the government's planning to take.

THE COURT: Well, have they made a promise in the

plea agreement?

MS. SHERRILL: They have, Your Honor.

THE COURT: That you think they're going to breach?

MS. SHERRILL: I do, Your Honor.

THE COURT: What is that?

MS. SHERRILL: I believe they're going to support the PSR and go with actual methamphetamine instead of mixture.

THE COURT: So where in the plea agreement did they promise that they would not reference actual methamphetamine?

MS. SHERRILL: When you look at the -- when I look at the plea agreement, Your Honor, and the factual basis statement which is part of, in my opinion, the plea agreement, the facts that support that factual basis statement are agreements that the facts that the government and the defense agreed to, and inside that factual basis statement claims 500 grams or more of a mixture or substance of methamphetamine.

These are facts that both sides agreed upon when we signed that plea agreement.

THE COURT: But they don't -- in the plea agreement they haven't made a promise that they will only argue that a mixture or substance applies. In fact, they specifically indicate that probation may find otherwise.

MS. SHERRILL: They do, and probation can find otherwise. It depends, again, on the case law of what stance

and position the government takes at this sentencing hearing today. Although, we're still prepared to argue that by them failing to object to the PSR, they have weakened their position that they are not going to advocate for that plea agreement.

THE COURT: Well, I don't know what their position will be, but I don't think failing to object to the presentence report violates the plea agreement, and I also think if the government argues for a guideline sentence as determined in the presentence report, that that would violate the plea agreement, and I told Ms. Sherrill that she can certainly take that issue up on appeal if the issue's preserved for appeal.

Ms. Sherrill?

MS. SHERRILL: Yes, Your Honor. If I may, I will just argue the objection at this point.

THE COURT: All right.

MS. SHERRILL: Okay. In United States v. Edgil (phonetic), a Fourth Circuit case -- and if the Court would like the citation, I can certainly provide that. This case involved a plea agreement whereby the government and the defendant entered into a stipulation for the purposes of determining the base offense level, which corresponded with the sentencing range of 10 to 16 months. After the plea agreement was signed by both parties, the government received,

at that point, the lab results, which came back as actual methamphetamine. This increased Edgil's sentencing range to 30 to 37 months. At sentencing, the government advocated for a sentence consistent with this increased range from the PSR.

The Fourth Circuit Court of Appeals found that the government's advocation for the higher sentence was a breach of the plea agreement when it lacked -- when it failed at sentencing to honor its stipulation. It was the government's duty to continue to advocate for acceptance of agreement.

In U.S. v. Fowler, an Eighth Circuit case, there, the circuit court did find that the government did materially breach its plea agreement. Now, Fowler did not involve drugs, but the agreement contemplated a number of sentencing issues, including Fowler's estimated total offense level. The plea agreement in that case was very comprehensive; it was not a boilerplate agreement. There, the plea agreement did not recommend a career offender enhancement. The PSR, however, did.

In Fowler, the government responded to the PSR, the written stage, devoting a majority of its written response to supporting the PSR's position. At the sentencing hearing, the government again argued for the enhancement. The Eighth Circuit stated: "Our circuit views plea agreements as contracts that require both parties to fulfill their obligation under that contract." As further noted by the

Eighth Circuit: "A plea agreement involves matters of constitutional significance, and the failure of the government to abide by the promises therein violates a defendant's due process rights."

So it's our argument that implicit in this agreement, Your Honor, pursuant to that factual basis statement, is a stipulation for a base offense level of 32, placing the sentencing range between 57 and 71 months. The base offense level in this instance did induce Mr. Ibrahim to agree to that plea agreement. If that plea agreement had a proposed base offense level of 38 for actual methamphetamine, it is likely counsel would have advised defendant very differently.

This matter here is distinguishable from Edgil, in that in Edgil, the lab results indicated results indicating actual were not received until after the plea agreement was signed. In Fowler, however, the government should have and could have known that the career offender enhancement was available to them, and they chose not to address it in the plea agreement.

That is no different than here, where the government could have and should have known the purity of that methamphetamine before the plea agreement was signed. Here, the lab results were received February 10th of 2021. The indictment was signed May 4th, 2021. We received, the defense

received the results June 2nd of 2021. This agreement was not entered into until May 19th of 2022.

The defendant, Mr. Ibrahim, should be entitled to receive the benefit of his bargain. Had the plea agreement stated methamphetamine actual, again, the advice of counsel and the defendant's ultimate choice may have been very different. By failing to object to the actual methamphetamine categorization in the PSR, and certainly depending on their conduct at this hearing today, the government has breached their plea agreement. The plea agreement was drafted by the government, the factual basis statement was drafted by the government, the time for written objections to the PSR has passed, and the government has remained silent.

Thus, the defendant can only assume at this point that the government, contrary to the plea agreement, agrees and supports that the actual methamphetamine and the -- is the proper categorization in this case.

Thank you.

THE COURT: Mr. Jehangiri, would you like to address this issue?

MR. JEHANGIRI: Very briefly.

The factual basis statement provides, in part -- in the last paragraph it provides, in part, as found in paragraph 5 of the presentence report: "The parties submit that the foregoing statement of facts is not intended to be a

complete description of the offense or the defendant's involvement in it. Instead, this statement is offered for the limited purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(b)(3). The parties understand that additional information relevant to sentencing, including additional drug quantities, may be developed and attributed to the defendant for sentencing purposes."

That's part of the plea agreement.

Moreover, the terms of the plea agreement, paragraph -- I'll say provision C -- excuse me, not C, G. "At the sentencing hearing"-- found at page 4 of the plea agreement. "At the sentencing hearing, both the United States and the defendant are free to recommend whatever sentence each feels is appropriate within statutory limits, present evidence and make arguments in support thereof. The defendant understands that any recommendation by him or the United States is not binding on the Court. The defendant further understands that he may not withdraw his plea of guilty if the Court rejects any recommendation."

I don't see how this objection would, and our action following the issuance of the presentence report would be a pre -- that issue is attributable in only two paragraphs where this conspiracy -- two paragraphs relating to conduct in and around the October 2021 timeframe. However, this conspiracy lasted much longer than that, dating back into 2019 involving

several individuals, including this defendant.

I think the presentence report calculation of the guideline range is appropriate and supported by the evidence.

That's all I have.

THE COURT: So with regard to the alleged breach, this case is not the same as those cited by Ms. Sherrill. In those instances, in the one case, the government and the defendant had agreed to certain guideline ranges for different enhancements that were to be applied and for the base offense level. There's no such agreement in this plea agreement. In fact, in this plea agreement, the factual basis statement specifically states otherwise. It indicates that there is no agreement regarding quantity.

In the plea agreement itself, paragraph G indicates that both sides can argue for whatever sentence they feel is appropriate within the statutory limits, and there's nothing within this plea agreement that indicates that a particular base offense level applies, that the government agrees that that's the base offense level, or that a particular sentence will apply. In fact, it leaves it open that both sides can argue anything within the statutory limits.

So I find that there has not been a breach of the plea agreement. There are not any promises set forth in the plea agreement that would require the government to object to using actual meth instead of a mixture or substance containing

meth. Nothing requires them to object to the use of actual meth in the presentence report or to argue that a sentence should be based on a mixture or substance containing methamphetamine.

So I'm going to overrule that objection of the defendant.

I think there's another objection of the defendant which is just based as a matter of policy, that the Court should use a mixture or substance because that's what's charged in the indictment, instead of using actual meth. Ms. Sherrill, did you want to address that argument? Because that's -- I think that's the part we discussed last time when we were here.

MS. SHERRILL: Yes, Your Honor, I did argue that portion last time. Would you like me to --

THE COURT: Okay. And I ruled against you last time?

MS. SHERRILL: I believe so.

THE COURT: I did.

So I think that addresses all of the objections of the defendant.

So I wanted to bring up one issue with regard to the presentence report, and that's with regard to the adjustment for role in the offense. The defendant was given a two-level reduction for being a minor participant. His role in this

conspiracy were limited to renting a storage unit where methamphetamine was kept, and he provided addresses where methamphetamine could be shipped to. There is no evidence indicating that he was a seller of methamphetamine himself or that he had any larger role than that. So my question is whether there should be a four-level adjustment for being a minimal participant instead of the two-level adjustment for being a minor participant.

Ms. Sherrill, if you'd like to address that?

MS. SHERRILL: Yes, Your Honor.

I do not have the definitions of minor or minimal, but if I recall properly from the Federal Sentencing Guidelines, the minor is, of course, over top of the minimal, and he did have very minimal participation in this.

If you look at the rest of the PSR, if you look at Sameer Gentry, or Matthew Houff, or any of those, at no time really was his name at all mentioned. He was not involved really in the actual distribution. He knew nothing about the actual methamphetamine that was being distributed. As you'll hear me argue later, he was simply trying to help, for whatever reason. And that's the only part that he took place in with this conspiracy. He really had very limited knowledge, if any knowledge at all, about the actual methamphetamine.

THE COURT: Mr. Jehangiri?

MR. JEHANGIRI: I share the same reading. It appears that there are several other individuals that are emersed in the conduct, the drug dealing, money changing hands, significant amounts of weight.

And you see some of the sentences that have been imposed on the co-defendants. Their involvement, as it reads in this PSR, is significantly overshadowing Mr. Ibrahim's. If seems to me, in my understanding of this case as to this defendant only, he was facilitating that storage unit.

So I'm looking at these factors under 3B1.2C, in the application notes, 3(C), and it lists, there's five listed. I don't -- I don't believe he had a decision-making authority. I don't think -- I think the conspiracy was long running. His involvement, though, may be much shorter in scope. I think he was planning and organizing his activity as it relates to, you know, the rental, but as to large-scale distribution, I don't think this defendant was involved in that aspect of the conspiracy. Certainly he was organizing and planning the rental. I think he took a trip to California. He benefited financially, but I think I would say that's pretty nominal. I was actually surprised at how little money he made.

Even in the factual basis statement he's getting $300 per address, and he made a few thousand, not even $3000 with regard to the storage unit. For the amount of weight that was involved with this conspiracy, I think that's

pretty -- that's peanuts.

So that's all I have.

THE COURT: So I find that a four-level reduction should apply, and I'm basing that on the fact that this was a large international drug trafficking organization that involved Houff and Gentry. The investigation into the two of them was pretty extensive and long running, and then at the very end is when Mr. Ibrahim's role was identified. Law enforcement had already recovered 42 pounds of meth before they even identified Mr. Ibrahim. Mr. Ibrahim's role was limited primarily to providing a storage unit and providing a few names of individuals where meth could be sent to.

The amount of money that he received for his involvement was very minimal compared to the amount of money involved in this conspiracy as a whole.

There's no evidence that he knew the scope or structure of the entire criminal activity. He planned his little part of it but wasn't involved in the overall planning or organization of the conspiracy. He didn't exercise any decision-making authority over anyone other than himself, and his benefit was minimal.

So I find under 3B1.2 that the defendant's entitled to a four-level reduction as a minimal participant instead of the two levels that was attributed to him in the report.

The defendant also had objections 2 and 3. Two

and 3 are moot because I ruled against the defendant on objection number 1, but it does -- my ruling on the minimal participant changes paragraph 25 and changes the total offense level.

So based on my ruling, the total offense level is a 27, and the defendant's in Criminal Category I. The advisory guideline range is 70 to 87 months in custody; supervised release is two to five years; the defendant's not eligible for probation; the fine range is $25,000 to $10 million; restitution's not applicable; and there's a $100 special assessment.

Counsel, do you agree based on my rulings?

MR. JEHANGIRI: Yes, Your Honor.

MS. SHERRILL: Yes, Your Honor.

THE COURT: And I did review letters that were written on behalf of the defendant from Lakeisha Abernathy, Trisha Delaney, Alicia Vandrizen (phonetic), and two letters from Glenda East, and a letter from Amy East, and I read the defendant's motion for downward variance.

Anything else I should have reviewed that I haven't identified?

MS. SHERRILL: No, Your Honor.

MR. JEHANGIRI: Nothing from the United States, Judge.

THE COURT: Ms. Sherrill, would you like to speak on

behalf of your client?

MS. SHERRILL: Yes. Thank you, Your Honor.

Since Ibrahim has arrived in the USA, he's had a steady history of employment. He does not have any significant criminal history, as you've noted. And I think the only reason that Ibrahim is before you today honestly is just his nature of trying to help others, and here it just was not a wise decision at all.

Ever since Ibrahim has married Lakeisha in 2001 and had a child of his own, his attitude has significantly shifted. I think this is evidenced by the significant assistance he's provided, and I'll leave it at that. But I think that went a long way to his credibility and his integrity and said, hey, I know I screwed that up, but here you go. And I think that says a lot about him.

He is Safety Valve eligible; no violence.

THE COURT: And his guideline range already recognizes that.

MS. SHERRILL: Yes.

We -- I would request that because he can come below -- he can come below the minimum, mandatory minimum, that he doesn't do any more than two years, Your Honor. We're also asking the Court to consider placing Ibrahim in -- at FPC Yankton.

THE COURT: So I don't make the determination on

where the defendant is placed; the Bureau of Prisons makes that determination. I can make a recommendation to them, but I don't determine placement.

MS. SHERRILL: Understood.

We would just ask that he be placed in a very minimal security place if he is incarcerated. I think he's shown that he's willing to follow the rules and to do what he's supposed to do.

THE COURT: Thank you.

So Mr. Ibrahim, one thing I wanted to talk with you about is you mentioned that part of the reason that you got involved in this was that with COVID you didn't have a job and you didn't have money coming in.

THE DEFENDANT: Correct.

THE COURT: Whenever you get involved in illegal activity --

THE DEFENDANT: There's consequences.

THE COURT: -- there's always, I oftentimes see people are trying to make money from that, but you have the risk of going to prison.

THE DEFENDANT: Yes.

THE COURT: So you have to balance what's more important to you, and my guess is not going to prison is more important than making money.

THE DEFENDANT: Of course.

THE COURT: So just remember that in the future. Anytime you get involved in illegal activity, you've got that huge risk of going to prison.

THE DEFENDANT: Yeah, Your Honor. I didn't have nobody at the time. No family, nothing to worry about, no regrets. But now I have so much to look out for, that's why.

THE COURT: Right.

So one of the things that impressed me when I read your report was that you're like an outstanding student. Got A-pluses in high school, A's in college, and you were studying engineering.

THE DEFENDANT: Yes.

THE COURT: You're incredibly bright. And then now you've started two of your own businesses.

THE DEFENDANT: Yes.

THE COURT: When you finish your time, is that what you expect to go back to are your businesses?

THE DEFENDANT: Yes.

THE COURT: And do you have somebody to run them while you're gone?

THE DEFENDANT: Yes.

THE COURT: You've got an excellent work history. You've done a huge variety of jobs. Before you started your business, what would you say was the job you enjoyed the most?

THE DEFENDANT: Truck driving.

THE COURT:  Truck driving?

THE DEFENDANT:  Yeah.

THE COURT:  How come?

THE DEFENDANT:  New places to see.  Yeah, but that's about it.  Yeah, I like to travel.  So, yeah, that's about it.

THE COURT:  Were you doing long-haul driving?

THE DEFENDANT:  Yes.

THE COURT:  All across the United States?

THE DEFENDANT:  Yes.

THE COURT:  And I think -- is that what you were doing when COVID hit?

THE DEFENDANT:  After COVID, yes.  And before COVID I was in town truck driving, yes.

THE COURT:  Okay.  So now you're married?

THE DEFENDANT:  Yes.

THE COURT:  And you've got a one-year-old?

THE DEFENDANT:  Yes.

THE COURT:  Can you tell me about Emir?

THE DEFENDANT:  Emir is, he's a whole mess.  He's, I don't know, he's a momma boy, and he just, he was sick the whole weekend.  He's now recovering.  He's got stuffy nose and everything.  And, yeah, he's just a whole joy by himself.  I don't know.  I love, you know, being a dad and everything.  So, yeah, I don't know.

THE COURT:  Your dad died when you were still pretty

young?

THE DEFENDANT: Yes.

THE COURT: And then you emigrated to the United States, but the rest of your family is still in Iraq?

THE DEFENDANT: Yes.

THE COURT: What brought you here?

THE DEFENDANT: I wanted to better myself. Like first when I was working for United States Marine Corps, they recommended me to leave the country because I was in danger, and ...

THE COURT: Were you doing interpreting?

THE DEFENDANT: Yes.

And then so I traveled to Egypt, and I lived there. But I don't know, it just wasn't for me, because I was alone there and I couldn't go home, and there's not a lot of education. So I thought about it, and, you know, and I wanted to come -- first wanted to go to Australia, but I couldn't. And then when I went to the embassy they told me, if you have the letter of recommendation from the Army, from a general, you can bring it to us and we'll help you.

So I did that, and, yeah, within six months I got my Visa, came here. And my purpose was just like the movies, happy ending, you know, like good life, but I found out, no, you have to work hard, and, yeah, that's why I focus on working, and I didn't study, you know, like, and here we go.

THE COURT: So how did you end up in South Dakota?

THE DEFENDANT: They told me, when you get your visa they ask you if you have -- you prefer a spot, and I have a friend who live in Michigan, but they said, no, it's a relative only. So they said, okay, we're going to randomly select for you. So they said Sioux Falls. Took me two weeks to understand Sioux Falls. Like the "X," I can't ... yeah. So, yeah, I came here 2010, stayed in the Elbert house, and it took me a month to understand to go to the gas station that's right there. I got lost three times, yeah, just going there.

And, yeah, ever since I came here, I visited and lived in Alaska and went all over, but I always come back Sioux Falls. I don't know.

THE COURT: So did you speak -- well, you must have spoken English, because you were translating.

THE DEFENDANT: Yes. Wheel of Fortune, Your Honor. I was watching Wheel of Fortune.

THE COURT: From watching Wheel of Fortune?

THE DEFENDANT: All the time. I don't understand it first, but I was watching it over and over until I start understanding, and then, yeah. Yeah, and Jeopardy? Is that what you call that other show?

THE COURT: Yeah.

THE DEFENDANT: Yeah, I was watching them all the time, so ...

THE COURT: Okay. Thanks.

THE DEFENDANT: Yeah, you're welcome.

THE COURT: Did any -- I think your wife went out in the hallway.

THE DEFENDANT: Yeah, with the baby. Because he's fussy.

THE COURT: Did you want to say something? Do you know?

THE DEFENDANT: No, the baby won't let her.

THE COURT: Okay. Sure.

THE DEFENDANT: This is my mom.

AUDIENCE MEMBER: I'm mom-in-law; hi.

THE COURT: Hi.

Did you want to say anything?

THE WITNESS: Sure.

THE COURT: If you could come up and use the microphone on the podium up here. Right up here.

If you'd start with my name.

THE WITNESS: My name's Lakeisha Abernathy.

THE COURT: And what did you want to tell me?

THE WITNESS: Ibrahim is just a great guy all the way around, and I don't think his mistake should define who he is now. He's the best father and stepfather to my five-year-old son, and he takes really great care of all of us, and he'll do anything for anyone. And it'd just mean

everything to have him as close as he can be to us no matter what happens today. And ...

THE COURT: Is that Emir?

THE WITNESS: This is Emir. This is our son. He's one years old, full of sass. Aren't you?

THE COURT: Not quite sure what's going on here.

THE WITNESS: No. He has just took a nap before this, and he is ready to do stuff, but ...

THE COURT: Ready to rock and roll?

THE WITNESS: Yeah.

THE COURT: Okay. Thank you.

Mom-in-law, did you want to say anything? You gotta come up and use the microphone on the podium, and if you'd start with your name.

THE WITNESS: I'm Glenda Anna East, and I am Lakeisha's mom. I'm a storyteller, and I'll keep it short.

My kids grew up really hard and really fast, and Lakeisha had a girl, you know, start life hard on her own. And our family's slowly coming back together, and I just want to say that I met Ibrahim a couple years ago, and he provides. We've talked, you know, at length about what happened, and I honestly, I just can see the sincerity in him and that he really truly makes -- he said, I -- you know, he understands what he did and he's not trying to make excuses and he understands there's consequences, but, you know, I feel like

my -- the same as my daughter feels, you know, that what the choice that he made to get involved does not define who that man is. He has integrity. He has character.

He hosted us all for Christmas, and I got to observe and watch the family. And he's a very productive member of society, and Ibrahim is a good man. So I -- you know, we're going to, you know, whatever happens, we're ready and we're strong and we're a family. We're going to stick together. But, you know, he deserves a second chance.

So that's what I got.

THE COURT: Okay. Thank you.

THE WITNESS: Yep, thank you.

THE COURT: Mr. Jehangiri.

MR. JEHANGIRI: Thank you, Judge.

This is a case why -- an example of why the Safety Valve exists.

This is an individual who is young, no criminal history, strong education, exceptional worker starting these companies. I think the guideline range is appropriate at the low end for purposes of today's hearing. Not asking that the Court impose or take him into custody today. I think self-reporting would be appropriate under these circumstances.

So I recommend a low end, Your Honor, two years of supervised release, the $100 special assessment.

That's all I have.

THE COURT: Thank you.

Mr. Ibrahim, our community's just been flooded with methamphetamine, and I see cases every day where families are really impacted by that drug; parents that use the money to buy meth instead of clothes and shoes and things that their kids need, and anybody's role in bringing meth into the community just hurts the whole community. So it's so important that you don't ever get involved in something like this again. You've got such incredible potential, between being an A, A-plus student, having three years of college with an engineering emphasis, being able to start and run your own businesses and do it successfully, having a stellar employment history in the past. So I know that you can be incredibly successful. You've just gotta make sure that you don't let money get in the way of making good decisions.

And I think now that you're married and you have your own child, plus your wife's child to help take care of, you've got your priorities more in line with what they need to be, but unfortunately the activity that you were involved with in the past was illegal.

In deciding your sentence, one of the things that I always look at is somebody's criminal history, and you come here with only one prior criminal history point and you're 35. Usually by that time somebody that's going to be in a lot of trouble's racked up a lot of criminal history points, but you

have not. So I don't think that it's likely that you'll be involved in illegal activity in the future. And because of that, I am going to downward vary and sentence you to 60 months in custody, and then you'll be on supervised release for three years after that, where you'll be working with the probation officer to make sure that you're on the right path.

THE DEFENDANT: Okay, Your Honor. Thank you.

THE COURT: If you'd please stand, I'll state the sentence, but I'm not going to impose it until counsel's had an opportunity to state any objections.

Based on the constitutional and statutory authority vested in this Court, it's the judgment of the Court that the defendant, Ibrahim Nasr Ibrahim, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 60 months.

You have a history of substance abuse in your background, and I think you'd be an excellent candidate for the Bureau of Prisons substance abuse treatment program, and I recommend that you be allowed to participate in that program.

When you're released from prison, you'll be on supervised release for a term of three years.

Within 72 hours of being released from the custody of the Bureau of Prisons, you'll need to report in person to the probation office in the district where you're released. While you're under supervision, you need to follow the

following mandatory conditions:

You must not commit another federal, state or local crime, you must not unlawfully possess a controlled substance, you must submit to one drug test within 15 days of being released from prison and at least two periodic drug tests thereafter as determined by the Court.

You must cooperate in the collection of DNA.

You must comply with the standard conditions that have been adopted by this Court, and the following special conditions:

You must submit your person, residence, place of business, vehicle, possessions, computer, smartphone, tablet or any other Internet-capable device, including passwords, to a search conducted by a United States probation officer without a warrant when the officer has reasonable suspicion of a violation of a condition of supervision.

You must not consume any alcoholic beverages or intoxicants, and you must not frequent establishments whose primary business is the sale of alcoholic beverages.

You must participate in a program approved by and at the direction of the probation office for the treatment of substance abuse.  You must submit a sample of your blood, breath or bodily fluids at the discretion or upon the request of the probation office.

I find that you do not have the ability to pay a

fine, so the fine is waived, but you do need to pay to the United States a special assessment of $100, which is due immediately.

And I recommend to the Bureau of Prisons that you be placed at a BOP facility as close to Sioux Falls, South Dakota, as possible.

Counsel, are either of you aware of any reason why the sentence can't be imposed as I stated?

MS. SHERRILL: No, Your Honor.

MR. JEHANGIRI: No, Your Honor.

THE COURT: Then it will be so imposed, and you can be seated.

Mr. Ibrahim, are you ready to go into custody today, or are you requesting that you self-surrender at a later time?

THE DEFENDANT: Later, just because the weather change, like I expect it to be cold, but like there's work to be done. So if Your Honor allow me to do that, that would be awesome.

THE COURT: So if I give two weeks, is that enough time?

THE DEFENDANT: Yes.

THE COURT: And can you get yourself to whatever place the Bureau of Prisons designates?

THE DEFENDANT: Yes.

THE COURT: Is two weeks enough time for a

designation?

UNIDENTIFIED SPEAKER: Usually two weeks, and then on that Tuesday, Judge.

THE COURT: Okay. So I'll let you remain on self-surrender.

THE DEFENDANT: Okay.

THE COURT: All the same conditions will apply that have been. You'll need to turn yourself in by noon on Tuesday, November 15th. So that's two weeks from tomorrow.

THE DEFENDANT: Okay.

THE COURT: And you need to be there by noon.

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I did also want to note that had I sustained the objections of the defendant, I would have imposed the same sentence that I did today.

Mr. Ibrahim, in your plea agreement you gave up the right to appeal unless I sentenced you higher than your advisory guideline range, and I sentenced you below that range, so you probably don't have the right to appeal. But if you think I made a mistake and the issue was preserved for appeal and you want to have another court review what I did, you'd need to file the notice of appeal within 14 days from today with the Clerk of Court's office. Do you understand that?

THE DEFENDANT: Okay, Your Honor. Yes, I do.

THE COURT:  Anything else from either side?

MR. JEHANGIRI:  No, thank you, Your Honor.

MS. SHERRILL:  No.

THE DEFENDANT:  No, Your Honor.

THE COURT:  We'll be adjourned then.

THE DEFENDANT:  Thank you, Your Honor.

(Proceedings concluded at 2:47 p.m.)

* * * * *

CERTIFICATE OF REPORTER

I, Stephen W. Franklin, Registered Merit Reporter, and Certified Realtime Reporter, certify that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.

Dated this 2nd day of FEBRUARY, 2023.


/s/Stephen W. Franklin
_____
Stephen W. Franklin, RMR, CRR